FILED
U.S. DISTRICT COURT
IN THE ~~DISTRICT OF MARYLAND~~ STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
2001 AUG -2  A 8: 51

LEIGH R. BENCH, JR.          CLERK'S OFFIC.
                            AT BALTIMORE
     v.              Y_____:DEPUTY  CIVIL NO. CCB-00-1625

HUTTIG BUILDING PRODUCTS, INC.  :
                                :

...o0o...

## MEMORANDUM

Plaintiff Leigh R. Bench, Jr., alleges that his former

employer, defendant Huttig Building Products, Inc., ("Huttig")

prevented him from obtaining several employment benefits, in

violation of various state laws, and the Employment Retirement

Income Security Act ("ERISA") 29 U.S.C. ¶ 1001 et seq. Pending

before this court is Huttig's motion for summary judgment, which

was filed on March 1, 2001. The matter has been fully briefed and

no hearing is necessary. See Local Rule 105.6. For reasons that

follow, the court will **grant** in part, and **deny** in part, the

defendant's motion for summary judgment.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides

that:

> [Summary judgment] shall be rendered forthwith if the
> pleadings, depositions, answers to interrogatories, and
> admissions on file, together with the affidavits, if any,
> show that there is no genuine issue as to any material fact
> and that the moving party is entitled to a judgment as a
> matter of law.

A genuine issue of material fact exists if there is sufficient

evidence for a reasonable jury to return a verdict in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Shaw v. Stroud, 13 F.3d 791, 798 (4ᵗʰ Cir. 1994). In making this determination, the evidence of the party opposing summary judgment is to be believed and all justifiable inferences drawn in his favor. Halperin v. Abacus Tech. Corp., 128 F.3d 191, 196 (4ᵗʰ Cir. 1997) (citing Anderson, 477 U.S. at 255). The non-moving party may not rest upon mere allegations or denials in his pleading, however, but must set forth specific facts showing that there is a genuine issue for trial. Anderson, 477 U.S. at 248; Allstate Fin. Corp. v. Financorp, Inc., 934 F.2d 55, 58 (4ᵗʰ Cir. 1991). The "mere existence of a scintilla of evidence in support of the plaintiff's position" is not enough to defeat a defendant's summary judgment motion. Anderson, 477 U.S. at 252.

## BACKGROUND

A. Employment History of Leigh Bench, Jr.

Leigh R. Bench, Jr., was employed by the Number One Supply Corporation ("Supply"), a family owned company founded in 1976 that distributed building materials. (Pl. Opp., Ex. A, Aff. of L. Bench at ¶2.) Mr. Bench was appointed as the president of Supply in 1993, and as its Chief Executive Officer in 1995. (Id., Ex. 1, Dep. of L. Bench at 24, 31.) In May 1998, Huttig acquired Supply. (Id., Ex. A, Aff. of L. Bench at ¶3.)

-2-

On May 29, 1998, in a letter that outlined the terms of agreement, Barry J. Kulpa, the President of Huttig, offered Mr. Bench the position of general manager of the former Supply operations. (Pl. Opp., Ex. 4, Letter of 5/29/98.) The former Supply operations (located in Baltimore, Maryland, and Raleigh, North Carolina) appear to have experienced considerable difficulties after the merger. Supply's senior sales person left the merged companies, taking a majority of Supply's former customers with him, and there were additional expenses associated with the merger. (Id., Ex. 1, Dep. of L. Bench at 80-81.) As a result of these financial difficulties, in December 1998, Huttig sought to enhance the profitability of the former Supply operation by transferring Mr. Bench to another program within the company. (Id., Ex. 1, Dep. of L. Bench at 83; Ex. 2, Dep. of B. Kulpa at 6.)

Mr. Kulpa offered Mr. Bench a position in a specialized training program known as Six Sigma.(Id., Ex. 2, Dep. of B. Kulpa at 9.) Mr. Bench was offered the same compensation package he had held in his previous position as general manager. (Id.) The continuance of his salary at this level meant that Mr. Bench was more highly compensated than was usual for participants in Six Sigma.(Pl. Opp., Ex. 9, Dep. of C. Gordon at 43.) There was also a possibility of an additional bonus based on his performance in Six Sigma. (Id., Ex. 2, Dep. of B. Kulpa at 9.)

Mr. Bench conducted negotiations over the proposed reassignment with Mr. Gordon, who was at that time manager of Six Sigma. Mr. Bench recalls that during these negotiations, he stressed that "relocation was not an acceptable alternative" because of extensive familial and professional ties in Maryland, and Mr. Gordon agreed to this demand.[1] (Id., Ex. 1, Dep. of L. Bench at 93.) Mr. Gordon recalls that Mr. Bench had objections to moving away from Maryland and traveling more than 25 to 30 percent of the time. (Id., Ex. 9, Dep. of C. Gordon at 17-18.)

Mr. Bench ended his work as general manager of the former Supply operations in February 1999 and participated in Six Sigma for five months. (Id., Ex. 1, Dep. of L. Bench at 101.) At the close of the training period, Mr. Bench presented his work at a company-wide meeting held on June 7, 1999. (Id., Ex. 10, Letter of 7/12/99.) After the presentation, Mr. Gordon approached Mr. Bench to discuss his ongoing participation in Six Sigma.

During this conversation, Mr. Gordon informed Mr. Bench that he "would be required to move to St. Louis. Otherwise, at some point in the future his employment would be terminated." (Id., Ex. 9, Dep. of C. Gordon at 31, Ex. 1, Dep. of L. Bench at 134-136.) Mr. Bench recalls that the suggested termination date was

---

[1]Mr. Bench claims that Mr. Kulpa was a participant in this conversation, (see Pl. Opp., Ex. 1, Dep. of L. Bench at 93), but Mr. Kulpa denies participation. (Pl. Opp., Ex. 2, Dep. of B. Kulpa at 11.)

-4-

July 31, 1999. Mr. Gordon stated that the relocation was proposed because he wanted to more closely supervise the participants involved with Six Sigma. (Id. at 38.) Mr. Bench subsequently proposed that he receive a cut in base compensation in exchange for remaining in Maryland. Mr. Gordon then suggested that Mr. Bench could remain in Maryland, if Mr. Bench accepted a reduction in his base compensation to an annual salary of $75,000. (Id. at 42-3, 47.)

On July 12, 1999, Mr. Bench rejected this second offer, stating he was disappointed that he "was asked to relocate to St. Louis, accept a $50,000 dollar reduction in base compensation, travel on a much more extensive basis than agreed, and relinquish any participation in vendor and product evaluation." He requested that his current compensation package and original job description remain intact. (Pl. Opp., Ex. 10, Letter of 7/12/99.) Mr. Bench concluded that "[i]f the terms of this request are not acceptable, my work should be reasonably well concluded by 8/15/99." (Id.) Mr. Bench subsequently e-mailed Thomas Tenhula, then the Vice President of Human Resources[2], on July 21, 1999, inquiring about the severance package provided by Huttig, citing his belief that his position was effectively eliminated by the

_____

[2]Mr. Tenhula has since become the Director of Human Resources for Huttig. (Pl. Opp., Ex. 3, Dep. of T. Tenhula at 5.)

-5-

modifications proposed by Mr. Gordon. (Pl. Opp., Ex. 11, E-Mail of 7/21/99.)

Mr. Tenhula responded to this request on the same day, noting that this "is not a severance situation" and Mr. Bench would be paid through the end of July, with two weeks of additional vacation leave. (Pl. Opp., Ex. 12, E-Mail of 7/21/99.) After another brief e-mail exchange, (Id., Ex. 13, E-Mail of 7/26/99), Mr. Tenhula offered Mr. Bench four weeks of accrued vacation leave in exchange for release of all other claims regarding the severance package. (Id., Ex. 14, Letter of 7/29/99, Release.) Mr. Bench refused to sign this release; his final day at Huttig was July 30, 1999. (Id., Ex. 15, Letter of 1/13/00.)

Mr. Bench wrote a letter to Mr. Kulpa in January 2000 that outlined his reasons for departure and calculated his severance payment. (Id.) Mr. Bench's attorney contacted Mr. Kulpa about Mr. Bench's claims in February 2000. (Id., Ex. 16, Letter of 2/2/00.) On receipt of this letter, Mr. Kulpa noted in its margins that "Chip was an owner—These things don't apply." (Id. Ex. 17, Letter of 2/2/00; Ex. 2, Dep. of B. Kulpa at 21-23.)

B.   Benefits Policies at Huttig

Although there were a variety of benefits offered by Huttig, three plans are at issue here: the severance policy, the vacation policy, and the automobile reimbursement policy. The severance policy applied in the event an employee's job was "permanently

-6-

eliminated or the employee [was] permanently laid off due to economic reasons."[3] (Pl. Opp., Ex. 8, Huttig Severance Policy.) Participation in the severance program was triggered by notification of the Regional Vice President and the Human Resource Department, prior to termination of the employee. Severance pay was distributed based on seniority. Mr. Bench would have qualified for the total maximum severance payment of 12.5 weeks, based on his twenty-two year career at the merged companies. (Id.)

The vacation policy and the automobile reimbursement policy offered additional benefits. Vacation, under Huttig's policy, was allocated to each employee based on seniority. The policy stated that "employees will receive payment for all unused vacation for [the] current year up to a maximum of two weeks unless otherwise dictated by state law." (Pl. Opp., Ex. 20, Vacation Policy at 2.) At the time of his departure, it appears that Mr. Bench would have been entitled to the maximum of two weeks of vacation. (Id., Pl. Opp., Ex. 12, E-mail of 7/21/99; Ex. 15, Letter of 1/13/00.)

The automobile allowance was offered to management personnel who used a vehicle for business-related reasons. Managers, such

---

[3]The "Crane" severance policy had been in place since January 1, 1988 and would have applied to Mr. Bench if he had been terminated in December 1998. This policy was revised in January 1999, however, and the applicable Huttig policy is described above. (See Pl. Opp., Ex. 7, Crane Severance Policy, Ex. 8, Huttig Severance Policy.)

as Mr. Bench, were paid a fixed amount of $550.00 dollars monthly that was included in each employee's paycheck. (Id., Ex. 21, Automobile Reimbursement Policy.) At the time of his departure, Mr. Bench claimed that he was entitled to a lump-sum payment of $2,935.03, a calculation based on the number of years he had worked for Huttig.(Id., Ex. 15, Letter of 1/13/00.)

## ANALYSIS

In his complaint, Mr. Bench alleges that Huttig: (1) breached the employment contract with regard to various compensation benefits (Count I); (2) violated the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. § 3-501 by failing to pay him accrued wages and other benefits (Count II); (3) accepted valuable services from Mr. Bench, and therefore, is subject to a claim of *quantum merit* (Count III); (4) accepted valuable services from Mr. Bench but refused to pay him a bonus and, therefore, was unjustly enriched (Count IV); (5) induced Mr. Bench to work for the company and then wrongfully denied him wages and other compensation benefits (Count V); and (6) violated ERISA by failing to pay Mr. Bench's severance, wages, and other compensation benefits (Count VI). As an initial matter, the court finds that Mr. Bench has sufficiently alleged a claim under Section 510(a) of ERISA, which prohibits an employer from interfering with the attainment of any protected rights under the statute. Additionally, the court finds that while the

-8-

state law claims based on the denial of severance benefits are preempted because they relate to a plan protected under ERISA, the state law claims related to the vacation and automobile allowance are not preempted because they are not protected benefit plans under ERISA.

A.   Claims Under ERISA

Mr. Bench has alleged a cognizable claim under Section 510(a) of ERISA, stating that Huttig offered substantially modified terms to his contract, so that it could effectively force his resignation in order to avoid payment of severance and other compensation benefits. See Pl. Opp. at 17. Section 510(a) of ERISA makes it unlawful for "any person to discharge...a participant or beneficiary...for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan..." 29 U.S.C. § 1140(a). While Mr. Bench has raised various claims related to this alleged violation of Section 510(a), the claim related to Huttig's severance policy is the only one properly raised, since the policy is an "employee welfare benefit plan" under ERISA. 29 U.S.C. § 1002(1); see also Holland v. Burlington, Inc., 772 F.2d 1140, 1145-46 (4ᵗʰ Cir. 1985), aff'd mem. sub nom., Brooks v. Burlington Indus., 477 U.S. 901, 106 S.Ct. 3267 (1986)(holding that a severance plan is an

$-9-$

employee welfare benefit plan under ERISA).[4]

Although Mr. Bench's severance benefits would not have
vested unless he was terminated under the terms of the plan[5],
Section 510(a) has been interpreted to extend to those situations
where a participant's eligibility rights under employee welfare
benefits plan have not yet vested. See Inter-Modal Rail Empl.
Assoc. v. Atchison, Topeka and Santa Fe Railway Co., 520 U.S.

_____

[4]As defined by ERISA, an employee welfare benefit plan is
"any plan, fund, or program which was ... established or
maintained by an employer or by an employee organization ... for
the purpose of providing for its participants or their
beneficiaries ... (A) medical, surgical, or hospital care or
benefits, or benefits in the event of sickness, accident,
disability, death or unemployment, or vacation benefits ... or
(B) any benefit described in section 186(c) of this title (other
than pensions on retirement or death, and insurance to provide
such pensions)." 29 U.S.C. § 1002(1).

[5] As noted by the Fourth Circuit in Hickey v. Digital Equip.
Corp., 43 F.3d 941, 947 (4ᵗʰ Cir. 1995)(quoting Lockhart v.
United Mine Workers of America 1974 Pension Trust, 5 F.3d 74, 78
(4ᵗʰ Cir. 1993)), "[t]he award of benefits under any ERISA plan
is governed in the first instance by the language of the plan
itself." Under the terms of the Huttig severance policy, Mr.
Bench was entitled to receive a severance payment if his position
was permanently eliminated or he was permanently laid off due to
economic reasons. The meaning of these terms is somewhat
ambiguous. Mr. Bench argues that the Six Sigma program was
discontinued, and that he was eligible for the plan because he
was terminated as a result of economic losses suffered by former
Supply operations. Mr. Tenhula, Huttig's human resources
representative, states that he had not considered whether Mr.
Bench was eligible for the plan because he believed Mr. Bench had
resigned his position. (Pl. Opp., Ex. 3, Dep. of T. Tenhula at
69.) For the purposes of this motion, drawing all inferences in
favor of the plaintiff, the court will assume that Mr. Bench is
eligible for the plan. The court further notes, however, that
this is a genuine issue of material fact which will have to be
addressed at trial.

-10-

510, 515, 117 S.Ct. 1513, 1515 (1997); <u>Stiltner v. Beretta U.S.A.</u>
<u>Corp.</u>, 74 F.3d 1473, 1481 (4th Cir. 1995)("[A]n employer may not
discriminate against an employee with the purpose of interfering
with an employee's <u>attainment</u> of certain rights.")(emphasis in
original.) In order to survive a motion for summary judgment
under Section 510(a), however, a plaintiff must do more than
raise vague allegations that the defendant realized cost-savings
from the discharge of an employee, but rather must demonstrate
that the defendant had a "specific intent" to interfere with his
pension rights. <u>Conkwright v. Westinghouse Electric Corp.</u>, 933
F.2d 231, 238-39 (4th Cir. 1991). To prove specific intent, a
plaintiff may rely on the burden-shifting analysis of <u>McDonnell-</u>
<u>Douglas</u> in the context of discriminatory discharge claims. <u>Id</u>. at
239; <u>see</u> <u>also</u> <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530
U.S. 133, 143, 120 S.Ct. 2097, 2106 (2000).

In this case, Huttig argues that it had a legitimate,
business-related reason for the substantially modified terms of
its offer to Mr. Bench, namely that it wanted to relocate Six
Sigma to its headquarters in St. Louis, thereby increasing the
program's cost-efficiency. Mr. Bench, however, has alleged
evidence sufficiently rebutting this proffered reason. Mr. Bench
contends that, given Mr. Gordon's knowledge of his strongly
stated desire to remain in Baltimore, the offer of relocation was
structured to force his resignation. Mr. Bench's counteroffer was

-11-

met with an offer to reduce his salary by a substantial amount,
which was, again, another offer made to provoke his resignation.
The substantially modified terms of the offers made by Mr.
Gordon, coupled with Mr. Kulpa's statement that former owners of
recently acquired companies were not eligible for retirement
benefits, could lead a reasonable fact finder to decide that
Huttig intentionally sought to avoid payment of severance
benefits to Mr. Bench. Accordingly, summary judgment will be
denied with regard to Mr. Bench's claim for severance benefits
under ERISA.

B.   Preemption of State Claims

Section 514(a) of ERISA preempts "any and all State laws
insofar as they may now or hereafter relate to any employee
benefit plan..." 29 U.S.C. § 1144(a). The Supreme Court has
interpreted the phrase "relates to" liberally, stating that "[a]
law 'relates to' an employee benefit plan, in the normal sense of
the phrase, if it has a connection with or reference to such a
plan." Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96-97, 103
S.Ct. 2890, 2900 (1983). As the Supreme Court further stated in
Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 139, 111 S.Ct.
478, 483 (1990), "under this 'broad common-sense meaning,' a
state law may 'relate to' a benefit plan, and thereby be
preempted, even if the law is not specifically designed to affect
such plans, or the effect is only indirect." This broad

-12-

preemption of state claims, however, only applies to benefit plans that are the subject of the comprehensive scheme outlined by ERISA; state law claims based on benefit plans not covered by ERISA are not preempted. See e.g., Massachusetts v. Morash, 490 U.S. 107, 120, 109 S.Ct. 1668, 1674-75 (1989)(holding that the preemption mandated by ERISA was not applicable to a vacation benefit plan that was not covered by the statute).

There is no question that the severance plan at issue here is an employee welfare benefit plan and, therefore, any claims that "relate to" this plan will be preempted. At least two of the state law claims – the breach of contract and the claim of *quantum merit* – are partly premised upon the contention that Huttig failed to pay Mr. Bench severance. In his opposition, Mr. Bench states that "Huttig's failure to pay severance constitutes a contract breach," and furthermore, that the *quantum merit* claim should survive summary judgment, because "Huttig has not paid any post-separation benefits to Mr. Bench." See Pl. Opp. at 26, 37. These statements reveal the extent to which the denial of severance benefits is the primary basis for each of these claims. Given that judgment on these claims could determine whether any benefits were paid, it is apparent that these claims are "related to" the severance payments, and, therefore, are preempted under ERISA. See Holland, 772 F.2d at 1147.

There are three other Huttig policies at issue: (1) the vacation policy; (2) the bonus associated with the Six Sigma training program; and (3) the automobile allowance policy.[6] None of these policies can be considered employee welfare benefit plans or employee pension benefit plans under ERISA.[7] Neither statutory or judicial precedent suggests that these policies are covered under ERISA.

The vacation policy at issue here does not appear to be anything other than a routine category of compensation not covered by the statute. See 29 C.F.R. § 2510.3-1(b)(3); Massachusetts, 490 U.S. at 115-18, 109 S.Ct. at 1673-4. The option to accumulate vacation time and defer it until termination does not automatically transform a vacation policy into an employee welfare benefit plan, for "[u]nlike normal severance pay, the employees' right to compensation for accrued vacation

---

[6]Mr. Bench raises a number of state law claims with regard to his reduced compensation during the last two weeks of July 1999. Wages uniformly are regarded as compensation. See 29 C.F.R. § 2510.3-1 (b)(1), 29 C.F.R. § 2510.3-2 (b)(2)(i). Accordingly, these claims are not preempted by ERISA.

[7]A pension plan is "any plan, fund or program which was ... established or maintained by an employer ... [which], by its express terms or as a result of surrounding circumstances ...(i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan." 29 U.S.C. § 1002(2)(A).

-14-

time is not contingent upon the termination of their employment."
See id., at 120, 1675.

Bonuses[8] and automobile allowance policies also are viewed
as regular compensation and, accordingly, are not covered under
ERISA. See 29 C.F.R. § 2510.3-2(c); DePew v. MNC Financial, Inc.,
819 F.Supp. 492, 496 (D. Md. 1993)(annual stock incentive
programs were bonuses and therefore not covered under ERISA);
McPherson v. Maryland Public Employees Council 67, 943 F. Supp.
579, 582 (D. Md. 1996), aff'd McPherson v. Maryland Public
Employees Council 67, 117 F.3d 1414 (4th Cir. 1997)(automobile
allowance policy is not a benefit plan protected under ERISA).
Mr. Bench's state law claims to recover these items of
compensation are not preempted, since none are covered by ERISA.

B.   Remaining State Law Claims

There are four remaining state law claims. Maryland law will
govern in this diversity action. See GSM Dealer Serv., Inc. v.
Chrysler Corp., 32 F.3d 139, 142 (4th Cir. 1994)(law of the forum
state will apply in a diversity action).

_____

[8]29 C.F.R. § 2510.3-2(c) states that "payments made by an
employer to some or all of its employees as bonuses for work
performed, unless such payments are systematically deferred to
the termination cf covered employment or beyond, or so as to
provide retirement income to employees," will not be defined as
an "employee pension benefit plan" and "pension plan." Mr.
Bench's claims fcr a bonus are related to his claims of unjust
enrichment and will be addressed below.

-15-

1.    Breach of Contract

Mr. Bench alleges that Huttig breached a contractual obligation by failing to pay him the correct amount of compensation benefits before and after his discharge. Under Maryland law, an at-will employee cannot maintain a claim for breach of contract unless the employee "can show the existence of some contractual obligation that was undertaken and subsequently breached by the employer." Ayers v. ARA Health Serv., Inc., 918 F. Supp. 143, 148 (D. Md. 1995)(citing Surburban Hosp., Inc. v. Dwiggins, 596 A.2d 1069 (1991)). The existence of employer policy directives regarding aspects of the employment relationship (such as pre and post termination benefits) "become contractual obligations when, with knowledge of their existence, employees start or continue to work for the employer." Dahl v. Brunswick Corp., 356 A.2d 221, 224 (Md. 1976); Bender v. Suburban Hosp., Inc., 758 A.2d 1090, 1113 (Md. Ct. Spec. App. 2000); Staggs v. Blue Cross of Maryland, Inc., 486 A.2d 798, 803 (Md. Ct. Spec. App. 1985).

In this instance, Huttig's offer letter of May 29, 1998, established certain contractual rights: a salary of $125,000; a monthly automobile allowance of $550; and three weeks of vacation.[9] See Pl. Opp., Ex. 4, Letter of 5/29/98. Huttig

_____

[9]Mr. Bench noted in his acceptance that his vacation should have been four weeks based on his twenty-two year tenure at

-16-

attempts to argue that the offer of these benefits was a non-binding obligation because the Huttig Policy Manual included a disclaimer that stated "[n]one of the guidelines, policies or benefits in this manual are intended, by reason of their publication, to confer any contractual rights or privileges upon employees." See Def. Repl., Ex. 1, Employee Policy Manual. This disclaimer, however, did not apply to agreements negotiated by the President, that were "in writing, dated and executed by the parties to the contract." Id. The offer letter of May 29, 1998, fulfills these requirements, thereby creating a number of binding obligations on Huttig.

Mr. Bench initially contends Huttig breached its contract with regard to the payment of wages. Mr. Bench calculates he was owed $2,083.34, based on services rendered in the last two weeks of July 1999, where he was paid based on an estimated annual salary of $75,000 dollars rather than his initial salary of $125,000 dollars. See Second Amend. Compl. at ¶12. Huttig argues that Mr. Bench accepted his modified salary, since he continued to work for Huttig even after he was notified that his salary was modified. See Def. Mem. Mot. Summ. J. at 8. Mr. Bench disputes this contention, arguing his continued work performance was not an acceptance of the modified terms of his contract with Huttig, noting he submitted at least two letters refusing this

Supply. (Pl. Opp., Ex. 4, Letter of 5/29/98.)

modification. This dispute over whether Mr. Bench accepted this modification of his salary presents a genuine issue of material fact and, accordingly, summary judgment will not be granted on this claim. See Summerville v. Microcom Corp., 42 F.3d 891, 894 (4th Cir. 1994)(issues of offer and acceptance related to the modification of employment contract were factual issues that could not be resolved on summary judgment).

Mr. Bench's next claim is that Huttig failed to pay him the value of his accrued vacation and automobile allowance after his discharge. As to the automobile allowance policy, there has been no evidence presented (other than Mr. Bench's conclusory allegation that Mr. Kulpa told him the automobile allowance was available after discharge) to establish that the benefits of this policy continued after termination. The automobile allowance policy does not contain any language suggesting that payment obligation continued beyond the employee's termination. See Pl. Opp., Ex. 21, Automobile Reimbursement Policy. In contrast, the vacation policy guarantees that upon termination "employees will receive payment for all unused vacation for [the] current year up to a maximum of two weeks unless otherwise dictated by state law." Pl. Opp., Ex. 20, Vacation Policy at 2.

Given this contrasting language, it is clear that the automobile allowance policy created no additional obligation to pay benefits after termination and, accordingly, Huttig's motion

-18-

for summary judgment with regard to the automobile allowance will be granted. The vacation policy, on the other hand, appears to create a continuing obligation to provide an employee with up to two weeks of accrued leave. Huttig argues that since Mr. Bench was offered four weeks of vacation it has fulfilled its obligations under the contract. See Pl. Opp., Ex. 14, E-Mail of 7/29/99. This offer, however, was not unconditional as it required that Mr. Bench sign a release of all his claims. It was not, therefore, a tender sufficient to relieve Huttig of its obligation to pay Mr. Bench his accrued vacation leave. See Platsis v. Diafokeris, 511 A.2d 535, 537-38 (Md. Ct. Spec. App. 1985).

## 2.   The Maryland Wage Payment and Collection Law

The Maryland Wage Payment and Collection Law allows an additional statutory remedy against an employer if the employer fails to pay wages and other categories of compensation due to an employee. See generally Battaglia v. Clinical Perfusionists Inc., 658 A.2d 680 (Md. 1995). Section 3-501(c) of the statute defines wages as "all compensation that is due to an employee for employment," a broad definition which includes such compensation-related items as bonuses, commissions, fringe benefits, and any other remuneration promised for services. See Md. Code. Ann., Lab. & Empl. § 3-501(c)(2). Mr. Bench argues that he is entitled to treble damages under the statute, resulting from Huttig's

-19-

alleged failure to pay wages, accrued vacation leave, and
automobile allowance benefits. For the same reasons applied to
the breach of contract claims, summary judgment will be denied on
the Maryland Wage Payment and Collection Law claims related to
wages, and granted as to the claim related to the automobile
allowance policy.

Huttig raises an additional argument with regard to the
accrued vacation leave that was available to Mr. Bench after
termination, contending that in Rhoads v. FDIC, 956 F. Supp.
1239, 1259-60 (D. Md. 1997), the court held that payments due
only at discharge were not protected under the Maryland Wage and
Collection Law. This argument, however, overstates the actual
holding of Rhoads.

In Rhoads, the court determined that the plaintiff's accrued
vacation pay was not protected compensation under Section 3-
501(c) because at the time of the plaintiff's termination, the
defendant's personnel policies "clearly stated that employees
terminated for cause were not due cash representing accrued
vacation pay." 956 F. Supp. at 1259. The court did not determine
that all payments due at discharge were not covered under the
statute, but only that this particular defendant's personnel
policies precluded the plaintiff's recovery. As the personnel
policies at issue here are clearly distinguishable from those
outlined in Rhoads, the motion will be denied.

-20-

3.    Claim of *Quantum Merit*

Mr. Bench also brings a claim of *quantum merit.* This claim,
however, is undermined by the existence of an express agreement
between the parties, which specifically addressed the services to
be rendered by each party. Therefore, the remedy of *quantum merit*
is unavailable. First Nat'l Bank v. Burton, Parsons, & Co., 470
A.2d 822, 829 (Md. Ct. Spec. App. 1984)(the existence of express
agreement renders the remedy of *quantum merit* unavailable); ABT
Assoc., Inc. v. JHPIEGO Corp., 104 F.Supp. 2d 523, 534 (D. Md.
2000). Summary judgment will be granted on Count III.

4.    Unjust Enrichment

Mr. Bench contends that Huttig was unjustly enriched because
Huttig failed to pay him a bonus for savings realized from
suggestions made by Mr. Bench during Six Sigma. Under Maryland
law, a plaintiff must establish three elements to support a claim
of unjust enrichment: (1) a benefit conferred upon the defendant
by the plaintiff; (2) an appreciation or knowledge by the
defendant of the benefit; and (3) the acceptance or retention by
the defendant of the benefit under such circumstances as to make
it inequitable for the defendant to retain the benefit without
payment of its value. ABT Assoc., 104 F. Supp. 2d at 535(citing
Everhart v. Miles, 422 A.2d 28, 31 (Md. Ct. Spec. App. 1980)).

"The measure of recovery for unjust enrichment is the gain
to the defendant, not the loss by the plaintiff." Id., (citing

-21-

Mass Transit Admin. v. Granite Constr. Co., 471 A.2d 1121, 1126
(Md. Ct. Spec. App. 1984)). In order to survive summary judgment,
"no claim of unjust enrichment may be asserted by plaintiff in
the absence of evidence establishing the amount of defendant's
enrichment." Id. at 535-6. In this instance, although Mr. Bench
alleges Mr. Gordon stated that Huttig "realized savings from its
transportation project," (see Pl. Opp., Ex. 9, Dep. of C. Gordon
at 92), Mr. Bench has never specifically identified any evidence
that establishes the amount of the defendant's enrichment and,
therefore, summary judgment is appropriate on Count IV.

5.   Promissory Estoppel

Mr. Bench also raises a claim of promissory estoppel,
alleging that Huttig promised to compensate Mr. Bench in
accordance with the employment contract, customs, and policies.
Under Maryland law, in order to state a claim for promissory
estoppel, the plaintiff must establish: "(1) a clear and definite
promise; (2) a reasonable expectation by the defendant that the
offer will induce action or forbearance on the part of the
plaintiff; (3) actual and reasonable action or forbearance by the
plaintiff; and (4) detriment to the plaintiff which can only be
avoided by the enforcement of the promise." Id. at 536 (citing
Pavel Enters., v. A.S. Johnson Co., 674 A.2d 521, 532 (Md.
1996)). Mr. Bench's claims must fail, as a matter of law, because
he has failed to demonstrate a detriment that could only be

-22-

remedied through the enforcement of the promises contained in the initial employment contract. Although Mr. Bench alleges that he did not seek alternative employment during his employment with Huttig, because of promises made by Huttig, thereby relying on those promises to his detriment, he has produced no evidence of any other available employment, leaving this claim "speculative at best." Id. Accordingly, summary judgment is warranted on Count V.

A separate Order follows.

August 2, 2001
Date

Catherine C. Blake
United States District Judge

-23-